OPINION
{¶ 1} Plaintiffs-appellants, Edward James, Jr. and John James, appeal from a Mahoning County Common Pleas Court judgment in favor of defendant-appellee Maroun's Motors, Inc., following a trial to a magistrate on appellants' claims for breach of contract, negligent repair, and violation of the Consumer Sales Practices Act/Consumer Protection Statute, and appellee's counterclaim for an unpaid repair bill.
 {¶ 2} Appellant Edward James, Jr. is the titled owner of a 1986 Jaguar XJS. Appellant John James is Edward's brother and, at all relevant times had Edward's permission to exercise ownership and control of the Jaguar. John James will be referred to as appellant from this point forward.
 {¶ 3} On November 6, 2004, appellant was driving the Jaguar near Rochester, New York when it overheated. He had the car towed to a nearby repair shop where the crank pulley was replaced and he was told that he had blown a head gasket. Appellant then had the car towed to appellee Maroun's Motors, Inc. in Canfield. Maroun's is owned and operated by Antoine Maroun. Maroun will be referred to as appellee from this point forward.
 {¶ 4} Appellee first diagnosed the problem as a blown head gasket and, upon further inspection, warped heads. Appellee sent the warped heads to be reconditioned. However, they could not be completely reconditioned and remained somewhat warped. Appellee reinstalled the heads and sealed them so that, in his opinion, the amount of warping that remained would not affect the engine's running.
 {¶ 5} Appellant picked up the car and claimed that, upon driving it the next day, it overheated again and leaked transmission fluid. Appellant took the car back to appellee. He picked it up a few days later, drove it, and again complained that the car was overheating.
 {¶ 6} At this time, the parties agreed to take the car to a Cleveland Jaguar dealership for an independent opinion. The Cleveland dealership opined that the car misfired and overheated.
 {¶ 7} Next, appellant took the car to Catz Automotive. Catz replaced the *Page 2 
radiator, which did not fix the problem. So appellant finally took the car to Bobby Rahal's in Wexford, Pennsylvania. Bobby Rahal's diagnosed the problem as being burnt, scuffed, and cracked cylinder liners. The car was then transported back to Maroun's.
 {¶ 8} Appellant subsequently filed a complaint against appellee asserting claims for breach of contract, negligent repair, conversion, and violation of the Consumer Sales Practices Act and the Consumer Protection Statute. Appellant also filed a motion for possession of the Jaguar alleging that appellee unlawfully claimed a repairman's lien on the car and would not release the car to him. The court subsequently granted appellant a writ of replevin releasing the Jaguar to him. It further ordered that appellant was not to drive the car for 60 days so that it could be examined by an independent mechanic.
 {¶ 9} Appellee filed a counterclaim in response asserting that appellant owed him a balance of $3,004.29 for the repair work done and $690.12 for storage.
 {¶ 10} The case proceeded to a trial before a magistrate. The magistrate found that appellant did not prove that appellee was negligent when he failed to diagnose the cracked, scuffed, and burnt cylinders because the condition likely did not exist when appellee performed the repairs. He further found that the evidence did not establish that appellee performed the repairs negligently or in an unworkmanlike manner. The magistrate went on to find that appellant likewise failed to prove that appellee committed Consumer Sales violations. Next, the magistrate noted that the parties agreed that appellee damaged the hood of the Jaguar while performing repairs and that the estimated cost of repairing the hood was $208.98. The magistrate then found that appellant's claim for conversion was rendered moot by his prior recovery of the car. As to appellee's storage counterclaim, the magistrate found that appellee failed to prove that he had any agreement with appellant to store the car. Therefore, the magistrate found there was no proof to support appellee's claim for storage fees. Finally, the magistrate entered judgment in favor of appellant for $208.98, for the damage to the hood, and judgment in favor *Page 3 
of appellee for $3,004.29, for the unpaid balance on work performed.
 {¶ 11} Appellant filed objections to the magistrate's decision, specifically arguing that the decision was against the manifest weight of the evidence. The court overruled appellant's objections, adopted the magistrate's decision, and entered judgment accordingly.
 {¶ 12} Appellant filed a timely notice of appeal on May 24, 2006.
 {¶ 13} Appellant raises two assignments of error, both alleging that the trial court's judgment was against the manifest weight of the evidence. A judgment supported by some competent, credible evidence going to all the material elements of the case must not be reversed as being against the manifest weight of the evidence. Willett v.Felger (Mar. 29, 1999), 7th Dist. No. 96-CP-40; Gerijo, Inc. v.Fairfield (1994), 70 Ohio St.3d 223, 226, 638 N.E.2d 533. Furthermore, in considering whether a judgment is against the manifest weight of the evidence, it is important that this court be guided by the presumption that the findings of the trier of fact are correct. Seasons Coal Co.,Inc. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. If the evidence is susceptible to more than one interpretation, we must construe the evidence consistently with the trial court's judgment.Gerijo, 70 Ohio St.3d at 226, 638 N.E.2d 533.
 {¶ 14} Appellant's first assignment of error states:
 {¶ 15} "THE DECISION OF THE TRIAL COURT REGARDING BREACH OF CONTRACT AND NEGLIGENT REPAIR IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 16} Appellant argues that the court's judgment on his negligent repair and breach of contract claims was against the manifest weight of the evidence.
 {¶ 17} First, appellant argues that the evidence demonstrated that the head gaskets were warped beyond repair. However, appellee led appellant to believe that even though the head gaskets were warped, he would be able to make them usable. Appellant states that his expert testified that appellee's attempt to salvage the head gaskets fell below industry standards. *Page 4 
 {¶ 18} As to the head gaskets, the following testimony is relevant.
 {¶ 19} Appellee testified that when appellant first brought the car to him and complained of it overheating, he determined that the head gaskets should be checked. (Tr. 35). Appellant agreed and appellee removed the head gaskets. (Tr. 43). Appellee subsequently sent the cylinder heads to a machine shop to be checked. (Tr. 45). The machine shop reported that the heads were warped. (Tr. 45). One head was warped .023 of an inch and the other was warped .022 of an inch. (Tr. 45). Appellee testified that in his opinion, the heads were not warped beyond repair. (Tr. 46-47). Appellee relayed this information to appellant. (Tr. 46). Appellant requested that appellee give him the heads so that he could get a second opinion. (Tr. 46). Appellee gave appellant the heads and appellant ultimately came back to appellee for advice on what to do. (Tr. 47). Appellee stated that he gave appellant two options: (1) shave .010 of an inch off of the heads and put them back in the car or (2) purchase and install rebuilt heads. (Tr. 47, 48). Appellee's advice to appellant was that he should not spend the money on rebuilt heads and should instead go with the first option. (Tr. 47). Appellee further told appellant that if the repair did not work, he would replace the heads with new ones without charging for additional labor. (Tr. 47-48). And he stated that it was appellant who ultimately made the decision as to how to proceed. (Tr. 238).
 {¶ 20} Appellee testified that the maximum that could be shaved off of the heads was .010 of an inch. (Tr. 48). By shaving this maximum allowance off each head, they would still be warped .012 and .013 of an inch respectively. (Tr. 48). Appellee stated that in his opinion, the heads would then be usable. (Tr. 49). He stated that he relayed this opinion to appellant. (Tr. 49).
 {¶ 21} Appellant, on the other hand, testified that he did not make the decision to repair the heads, appellee did. (Tr. 184). He stated that appellee said "we're going to use your heads" and that was it. (Tr. 184). However, he also stated that he gave appellee the okay to go ahead with the work. (Tr. 185).
 {¶ 22} Appellant's expert, Tom Zebrasky, testified that upon his inspection of *Page 5 
the head gaskets, which did not occur until after the car was taken to Bobby Rahal's and was disassembled, he saw that the heads were warped and did not seal correctly. (Tr. 77). Zebrasky opined that the warping on the heads was well beyond repair. (Tr. 87). He stated that only .005 of an inch could have been shaved off. (Tr. 87). However, on cross-examination when confronted with a report from ALLDATA which stated that the maximum allowance for a Jaguar like appellant's was .010 of an inch, Zebrasky acknowledged that others might recognize that resurfacing of .010 of an inch was acceptable. (Tr. 102-04).
 {¶ 23} The magistrate and court concluded that the heads, once refurbished and reinstalled, were not the cause of any continued problems with the car. They further concluded that, assuming the car continued to have overheating problems, this did not establish that the parts installed or the labor performed by appellee was substandard.
 {¶ 24} The evidence supports these conclusions. Although Zebrasky testified that the heads should not have been shaved down more than .005 of an inch, he did not testify that if appellee used new heads with no warping whatsoever the car would have been fixed. In fact, as will soon be discussed, Zebrasky opined that the problem was with the cylinders and cylinder liners. Thus, had appellee used brand new heads, if the problem was with the cylinders the car would still have overheated. Furthermore, as will also be discussed below, appellant testified that Zebrasky told him to replace the radiator to see if that fixed the overheating problem. It did not. However, Zebrasky told appellant that they had to eliminate one problem at a time to see if they fixed the overheating. Thus, repairing the heads in an effort to see if that fixed the overheating problem seems to have been a reasonable thing to do.
 {¶ 25} Appellant next argues that when he got the car back from appellee, it had the same problem as when he took it in. He states that the problem was confirmed by Cleveland Jaguar, Bobby Rahal's Jaguar, and his expert.
 {¶ 26} Appellant testified extensively on this matter. According to him, the second time he drove the car, after appellee repaired the heads, it overheated and *Page 6 
leaked transmission fluid and antifreeze. (Tr. 149). The following Monday appellant took the car back to appellee's shop and left it with the mechanic. (Tr. 152). Later that night, appellant received a call that the car was ready. (Tr. 152). Appellant picked the car up and found that the same problem existed. (Tr. 152-53). He stated that he drove the car at highway speed and it was okay but as soon as he would sit and let it idle, it would overheat. (Tr. 153).
 {¶ 27} Appellant brought the car back to appellee and the two agreed to get an independent opinion from Jaguar of Cleveland. (Tr. 54, 154). Appellee drove the car to Cleveland. (Tr. 155). Cleveland Jaguar reported that the car was misfiring on the right side, overheating, and leaking transmission fluid. (Tr. 155). However, Cleveland Jaguar never test drove the car. (Tr. 198; Pt. Ex. 5). Cleveland Jaguar also suggested that the car not be driven back to Youngstown because of a transmission leak. (Tr. 156, 197). So the car was taken on a flatbed back to appellee's shop. (Tr. 156). However, appellant admitted that the reason the car was towed back to Youngstown had nothing to do with the overheating. (Tr. 200).
 {¶ 28} Appellant next took the car to Catz Automotive. (Tr. 160). At Catz, Tom Zebrasky initially thought the problem might be the radiator. (Tr. 161). So appellant had Zebrasky replace the radiator. (Tr. 161). Zebrasky told appellant that fixing the car would be a process of elimination. (Tr. 161). Replacing the radiator did not solve the problem — according to appellant the car still overheated. (Tr. 161-62). Zebrasky then referred appellant to Bobby Rahal's in Wexford, Pennsylvania. (Tr. 164).
 {¶ 29} Catz took the car to Bobby Rahal's. (Tr. 206). Bobby Rahal's did not test drive the car. (Tr. 223).
 {¶ 30} Zebrasky went to Bobby Rahal's to inspect the engine parts once Bobby Rahal's disassembled the engine. (Tr. 74). He stated that two or three bores showed scuffing on the sides of the cylinder walls and that another cylinder had a crack in the cylinder wall. (Tr. 74-75). Zebrasky stated that these problems with the cylinders would cause a car to not idle correctly, stall, miss, overheat and sometimes *Page 7 
not run at all. (Tr. 76). He further stated that he noticed cylinder scoring, which is indicative of overheating. (Tr. 76).
 {¶ 31} Zebrasky opined that when appellee took the heads off originally, he should have also inspected the cylinder lining and informed appellant that the engine required major work. (Tr. 87). He opined that the cylinders were in a damaged state the first time appellee took the heads off. (Tr. 88). Zebrasky further opined that the cylinder cracked when appellant first had the problem with his car in Rochester, New York. (Tr. 88). And he opined that appellee should have discovered the cylinder problems when he had the heads off. (Tr. 89).
 {¶ 32} On cross-examination, Zebrasky admitted that he did not know whether appellee looked at the cylinders. (Tr. 91-92). And he admitted that he did not examine the car before appellant took it to appellee for the first time so he had no idea if the cylinder liner was cracked before appellee inspected it. (Tr. 96). He further admitted that he was assuming most of what he had testified to. (Tr. 96). And he admitted if a car has an overheating problem and someone continues to drive it, that can further damage the car. (Tr. 95). Finally, Zebrasky stated that before appellant even brought the car to appellee, it was severely overheated. (Tr. 120). When asked how he could know what the damage was to the car before inspecting it, Zebrasky stated that he had done several overheating jobs and they are all "pretty much the same." (Tr. 121).
 {¶ 33} Appellee testified that when appellant first brought the car in, he inspected the cylinders, cleaned each one, and double checked them. (Tr. 242-44). Appellee found no problems with the cylinders. (Tr. 44). He stated that he did not see a crack in any cylinder liner. (Tr. 244). Appellee further stated that if the car had a cracked cylinder liner when appellant first brought it to him, the car could not have been driven because it would have blown a hose due to the pressure in the cooling system. (Tr. 244). He stated that the car would have shut down. (Tr. 245).
 {¶ 34} Appellee also testified that when appellant brought the car back to him and complained that it was still overheating, he re-inspected the car. (Tr. 51). *Page 8 
Appellee also drove the car for two days to see if he could get it to overheat, but it did not do so. (Tr. 51). He stated that appellant brought the car back a few times and it never overheated when appellant brought it in. (Tr. 52). Appellee also testified that he and appellant went for a drive together and the car did not overheat. (Tr. 52-53). Appellee further stated that when he drove the car to Cleveland, it did not overheat. (Tr. 56).
 {¶ 35} Appellant admitted that his expert, Zebrasky, said it was okay for him to drive the car after he replaced the radiator. (Tr. 212). Appellant also admitted that Zebrasky did not tell him that he had a cracked cylinder at that time. (Tr. 212).
 {¶ 36} Interestingly, appellant also testified that his car cannot be driven. (Tr. 217). However, he also admitted that it was driven at least 345 miles in its un-drivable condition after it left appellee's shop. (Tr. 217, 221).
 {¶ 37} The magistrate and the trial court concluded that Zebrasky's testimony was unconvincing and somewhat speculative. The magistrate pointed out that appellee inspected the cylinders and testified that the cylinder problems Zebrasky testified to did not exist when he inspected them. He also noted that Zebrasky did not personally disassemble the engine to inspect the cylinders and when he finally did inspect the cylinders, the car had been driven several hundred additional miles. The magistrate further found that the fact that the car was driven several hundred miles after appellee worked on it and before it arrived at Bobby Rahal's contradicted Zebrasky's testimony that the extensive damage to the cylinders existed when the car first arrived at appellee's shop. He noted that both appellee and Zebrasky testified that the condition of the engine was very serious at the time it was inspected at Bobby Rahal's and operating the engine for any period of time would have resulted in the engine seizing up. Thus, the magistrate reasoned that it was improbable that the condition had existed for nearly a year and several hundred miles without major incident. Therefore, the magistrate concluded that appellant failed to sustain his burden of proving that the condition with the cylinders existed at the time appellee performed the repairs. *Page 9 
 {¶ 38} Competent, credible evidence exists to support the magistrate's and trial court's conclusions. Each of the magistrate's findings is supported by the evidence discussed above. Appellee testified that he inspected the cylinders when appellant initially brought the car to him and he did not find any damage to them. Zebrasky did not inspect the cylinders until close to a year later when the car had been driven in excess of 300 additional miles. Zebrasky admitted that most of what he testified to was based on assumptions. Both appellee and Zebrasky testified that when a car has an overheating problem and someone continues to drive it, further damage to the car is likely to result. This testimony supports appellee's testimony that the cylinder liners were not cracked when he inspected them.
 {¶ 39} This case was made up of conflicting evidence. Some of the testimony established that appellee did not fail to diagnose the problem with the car nor did he negligently repair it, while other testimony demonstrated just the opposite. Thus, this case rested on which witnesses were more credible. Such issues are best left to the trier of fact. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80,461 N.E.2d 1273. This is because the trier of fact is in a better position to judge the witnesses' credibility since it can observe the witnesses' demeanor, gestures, and voice inflections, and use these observations in weighing their credibility. Id. This was a fact-intensive case in which the magistrate simply found appellee to be a more credible witness. Since competent, credible evidence exists to support the trial court's judgment, we cannot find that the judgment was against the weight of the evidence.
 {¶ 40} Accordingly, appellant's first assignment of error is without merit.
 {¶ 41} Appellant's second assignment of error states:
 {¶ 42} "THE TRIAL COURT'S FAILURE TO FIND THAT DEFENDANT VIOLATED THE CONSUMER PROTECTION STATUTES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 43} Here appellant argues the court's judgment on his Consumer Sales Practices Act claims was against the manifest weight of the evidence. Specifically, *Page 10 
appellant points to Ohio Admin. Code 109:4-3-13, which provides in relevant part:
 {¶ 44} "(A) It shall be a deceptive act or practice in connection with a consumer transaction involving the performance of either repairs or any service upon a motor vehicle * * * to:
 {¶ 45} "(1) Fail, at the time of the initial face to face contact and prior to the commencement of any repair or service, to provide the consumer with a form which indicates the date, the identity of the supplier, the consumer's name and telephone number, the reasonably anticipated completion date and, if requested by the consumer, the anticipated cost of the repair or service. The form shall also clearly and conspicuously contain the following disclosures in substantially the following language:
 {¶ 46} "`Estimate
 {¶ 47} "You have the right to an estimate if the expected cost of repairs or services will be more than twenty-five dollars. Initial your choice:
 {¶ 48} "___ written estimate
 {¶ 49} "___ oral estimate
 {¶ 50} "___ no estimate'
 {¶ 51} "(2) Fail to post a sign in a conspicuous place within that area of the supplier's place of business to which consumers requesting any repair or service are directed by the supplier or to give the consumer a separate form at the time of the initial face to face contact and prior to the commencement of any repair or service which clearly and conspicuously contains the following language:
 {¶ 52} "`Notice
 {¶ 53} "If the expected cost of a repair or service is more than twenty-five dollars, you have the right to receive a written estimate, oral estimate, or you can choose to receive no estimate before we begin work. Your bill will not be higher than the estimate by more than ten per cent unless you approve a larger amount before repairs are finished. Ohio law requires us to give you a form so that you can choose either a written, oral, or no estimate.'" *Page 11 
 {¶ 54} Appellant asserts that the evidence demonstrated that appellee failed to comply with both Ohio Admin. Code 109:4-3-13(A)(1) and (2).
 {¶ 55} Ohio's Consumer Sales Practices Act, R.C. 1345.01 et seq., provides that no supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. R.C. 1345.02(A). R.C. 1345.05(B)(2) then provides that the Attorney General may adopt rules which further define or specify certain unfair or deceptive practices. Ohio Admin. Code 109:4-3-13 was adopted pursuant to this statute and defines certain deceptive practices regarding the performance of repairs or service upon motor vehicles. Weaver v.Armando's, Inc., 7th Dist. No. 02-CA-153, 2003-Ohio-4737, at ¶ 19.
 {¶ 56} As to Ohio Admin. Code 109:4-3-13(A)(1), appellee testified his initial face-to-face meeting with appellant occurred at his place of business. (Tr. 35). Appellee stated at that time, he gave appellant a form that stated the date, his name, appellant's name and phone number, the reasonably anticipated completion date, the anticipated cost of the repairs, and disclosed to appellant that he had a right to a written, oral, or no estimate. (Tr. 36-38). He stated however appellant did not sign the form. (Tr. 36). He also stated that he gave appellant an oral estimate. (Tr. 37). Appellee stated that he did not make appellant leave the form with him because he has known appellant for a long time. (Tr. 38). Appellant, on the other hand testified that appellee never showed him a form. (Tr. 143-44). Appellant did agree however, that appellee gave him an oral estimate before beginning any work on the car. (Tr. 176-77). And appellant stated that he trusted appellee. (Tr. 174).
 {¶ 57} This evidence indicates appellee's compliance with Ohio Admin. Code 109:4-3-13(A)(1). Appellee testified as to each element required. Although appellee did not have appellant sign the form that he referred to, there is no requirement in Ohio Admin. Code 109:4-3-13(A)(1) that the repairman must have the customer sign the required form. The Code does state that the customer is to initial his choice of oral, written, or no estimate. And while appellant did not initial the form, appellant and appellee agreed that appellee gave appellant an oral estimate and that appellant *Page 12 
did not request a written estimate.
 {¶ 58} As to Ohio Admin. Code 109:4-3-13(A)(2), appellee testified that in his shop he has a sign posted with the notice required by the Administrative Code. (Tr. 248). He also submitted a copy of the sign. (Def. Ex. 4). Appellee testified that the sign is posted on the wall by the service desk. (Tr. 249). However, appellant testified that appellee never directed him to any forms. (Tr. 143-44).
 {¶ 59} Appellee's testimony covers all elements required by Ohio Admin. Code 109:4-3-13(A)(2) except that he did not explicitly testify that he directed appellant to the notice on the wall. But during his testimony, appellee stated in general terms that he directed appellant to the form on the wall. (Tr. 36-39).
 {¶ 60} As to both Ohio Admin. Code 109:4-3-13(A)(1) and (2), there are conflicts in the evidence as was the case in appellant's first assignment of error. Appellee testified that he gave appellant the required notices and pointed him to the required forms while appellant testified that appellee failed to do so. Thus, these issues, like those in appellant's first assignment of error, turned on witness credibility. While appellant's testimony and appellee's testimony contradict each other, it was up to the magistrate and trial court, as the triers of fact, to assess their credibility. Seasons Coal Co.,10 Ohio St.3d at 80. Because competent, credible evidence exists to support the court's judgment, we cannot conclude that it is against the manifest weight of the evidence. Accordingly, appellant's second assignment of error is without merit. *Page 13 
 {¶ 61} For the reasons stated above, the trial court's judgment is hereby affirmed.
 Vukovich, J., and DeGenaro, P.J., concurs. *Page 1